LULA E. BASSETT *vs.* FRANK PEPE.

Third Judicial District, Bridgeport, April Term, 1920.
PRENTICE, C. J., WHEELER, BEACH, GAGER and CASE, Js.

In the development of its seashore property for residential purposes, a land company inserted a restrictive covenant in each of its deeds, forbidding the erection or maintenance of any barn or "outhouse" on the lot purchased. *Held:*—

1. That a private garage connected with the owner's dwelling-house and apparently a part of that structure, was not an "outhouse" within the commonly-accepted meaning of that word, nor was its erection and maintenance forbidden either by the letter or spirit of the restrictive covenant in question, when interpreted in accordance with the manifest purpose and intent of its makers.

Bassett *v.* Pepe.

2. That the trial court was palpably correct in concluding that such a structure, so located and used, would not be a nuisance at common law.

Restrictive covenants, being in derogation of the common-law right to use land for all lawful purposes, will not be extended by implication; if their language is of doubtful meaning, it will be construed against, rather than in favor of, the covenants.

Argued April 13th—decided May 7th, 1920.

SUIT to restrain the defendant from erecting a garage on his lot adjoining that of the plaintiff at Laurel Beach, Milford, in alleged violation of a restrictive covenant in his deed, brought to and tried by the Superior Court in New Haven County, *Warner, J.;* facts found and judgment rendered for the defendant, and appeal by the plaintiff. *No error.*

Some time prior to 1901, a land company purchased a large tract of land on the shore in Milford at what is known as Laurel Beach, and proceeded to develop it for summer residence purposes. Streets and building lots of various sizes, about three hundred in number, were laid out and mapped. All the conveyances of these lots to purchasers, save only of a few in a single section at one end of the tract, contained a restrictive covenant forbidding the erection or maintenance of any building or structure within three feet of the side lines, or the erection or maintenance of any barn or outhouse on the land conveyed. The defendant is the owner of a lot within this tract held by him under a deed containing this restriction. The plaintiff is the owner of an adjoining lot.

The land company's purchase, development and layout of the tract, and its imposition of the conditions in the restrictive covenant upon purchasers from it, were in the execution of a development scheme whose purpose was to promote "the establishment and maintenance of a high class residential summer colony, in

which the buildings should be kept at uniform distances from the street lines, and the whole community kept free from foul odors, unsightly and obnoxious buildings, and shelters for liquor selling, lewdness, or other improper and obnoxious practices."

The original.purchasers and .occupiers of lots were, and those who have since been attracted to locate their summer houses on the tract are, persons in comfortable financial circumstances and have become largely an automobile owning class. With many of them, automobiles constitute a necessary means of transportation, as formerly horses and carriages did. When the defendant purchased his lot it already had a house upon it, but no garage or other accommodations for housing an automobile. To provide such accommodations he began the erection of an annex to the house, designed for that purpose and planned to be permanently attached to the rear of the house and form a part of it. The attachment was to be about "ten feet in length upon one side of the house and eight feet" on another. At all points the new construction was to be located more than three feet distant from the division line between the parties. The work of construction had proceeded but a little way when a temporary injunction, issued in this action, put a stop to its continuance. The structure planned and begun was one to be built in a substantial manner, and would not have been unsightly in form or appearance.

The court ruled and held that the proposed structure was neither a barn nor an outhouse, in the strict sense of those words; that it was neither, within the meaning or intent of these words as used in the restrictive covenant in question; and that its erection and maintenance would not be in violation of either the letter or spirit of that covenant; and for those, and other incidental reasons assigned, dismissed the complaint. It

also found and held that it would not be a nuisance at common law.

Other facts contained in the finding, possessing no importance as related to the discussion contained in the opinion and its conclusion, are omitted.

*Carl Foster*, for the appellant (plaintiff).

*James E. McKnight*, for the appellee (defendant).

PRENTICE, C. J.   The plaintiff in her complaint sought to prevent the erection of the garage structure in question for three reasons: (1) that it was to be located within three feet of the division line between the plaintiff and the defendant, in violation of a restrictive covenant contained in the deed under which the latter holds; (2) that it would constitute an "outhouse" located upon the defendant's property, in violation of a provision in that covenant forbidding such erection; and (3) that it would constitute a common law nuisance.

The trial court has effectually disposed of the first of these reasons, in finding as a fact that the proposed structure would be in its every part more than three feet distant from the plaintiff's line.   It has also, with equal effect, disposed of the third reason, in holding, as it did with palpable correctness, that the planned structure, located as it was to be and used for its intended purpose, would not constitute a nuisance at common law.   We do not understand that plaintiff's counsel seriously questions either of these propositions. Certain it is that they are not open to such question upon this record.

The second reason assigned in support of the plaintiff's contention that the proposed structure would be an unlawful one as constituting an "outhouse," remains to be considered, and that is the fundamental one upon which the plaintiff relies in support of her appeal.

The portion of the restrictive covenant relied upon, forbids the erection and maintenance upon the defendant's property of any "barn or outhouse." Clearly the proposed structure intended for the uses of a garage would not be a barn, within any accepted use of that term of which we are aware. If its erection is forbidden by the restriction, it must be because it would constitute an " outhouse " within the meaning of that term as used in it.

The term " outhouse " is one whose meaning in the law has been brought to the attention of courts for the most part in criminal proceedings. It has become important in prosecutions for arson and burglary, to observe and define the lines of distinction between three classes of buildings, to wit, dwelling-houses proper, other buildings used in connection therewith and known as outhouses, and still other buildings not so used. In these cases the distinguishing feature of an outhouse has been found in its subserviency to the mansion-house—the principal building—from their relation or lack of relation to which the quality of all others is determined. "An outhouse is a building without the mansion-house, intended for the accommodation of the owner or occupant. It is the subserviency of it to the mansion-house, that gives it the denomination of an outhouse, and not the fact that it is included within the same fence, or what is denominated *the curtilage* or *homestead*." *State* v. *Brooks*, 4 Conn. 446, 448. This test serves to mark the distinction between outhouses and other buildings not including the manor-house, which do not possess the peculiar quality assigned to outhouses. It does not, however, assist in distinguishing between the dwelling-house and outhouses appurtenant thereto. There can be no doubt that the proposed garage satisfies the prescribed test to differentiate it from outside buildings. If, as constructed, it was to be

considered as a structure apart from the dwelling-house, there could be no doubt that, as a structure subservient to the use of the defendant's dwelling, it would fully meet the conditions entitling it to be considered as an outhouse. But we are not now concerned with distinctions between outhouses and other outside buildings. What we are concerned with is the question whether, in view of its attachment to the house, this garage is to be considered as a thing apart from the house.

The term "outhouse" naturally implies that the structure under consideration is not one with a dwelling-house. Clearly it must be something distinguishable and distinct from the dwelling-house to which it is subservient. Otherwise it were ill-named. Upon the question as to what the requirement as to distinction and separation imports and what it signifies, adjudicated cases, in so far as we have been able to discover, throw little light. Criminal cases do not, for the obvious reason that the law relative to arson and burglary attach no importance to a distinction between dwellings and outhouses. Perhaps the nearest approach to a judicial statement upon the subject is contained in our own cases of *State* v. *Brooks*, 4 Conn. 446, 448, and *State* v. *Powers*, 36 Conn. 77, 79. In the latter case it is said: "The dwelling-house is the principal building and the other buildings are appendages, and so they are called 'outhouses,' that is, houses separate from the main building, but useful to it as a dwelling." The expression in *State* v. *Brooks* is quoted above. The courts in civil cases likewise appear to have been seldom, if ever, called upon to discuss the subject under consideration, and we are aware of no case that has done so with any degree of precision and laid down definite rules in regard to it, and especially as to whether or not physical separation from the dwelling-house is essential, and if not, what will serve to distinguish the character of one

or two parts of a physically connected structure, as being that of a dwelling and of the other as an outhouse.

The law dictionaries, however, have undertaken to define the word, and many of these definitions embody the same idea found in the cases referred to, to wit: that physical separation from the mansion-house is essential to the constitution of an outhouse. 3 Bouvier's Law Dictionary, 2433; English's Law Dictionary, 593; Cyclopedic Law Dictionary, 659.

If we turn to our standard lexicons we find that they are in accord in defining an outhouse as being a building standing apart from and separated from the dwelling. In the Century Dictionary we find an outhouse defined as "a small house or building separate from the main house." Webster says that it is "a small house or building at a little distance from the main house." The Standard defines it as "a smaller building standing apart from, but appurtenant to, a main or large building or dwelling." These authorities unite in making physical separation from the dwelling-house an essential feature of an outhouse, as that word is used in ordinary speech. Whether or not they are strictly accurate from a legal point of view, they at least do establish a meaning of the word in which, as its ordinary meaning, it might well have been used in defining the restriction imposed upon the Laurel Beach properties.

In determining whether or not it was so used, it is necessary to bear in mind the accepted rules for the interpretation of restrictive covenants, set out at some length in *Easterbrook* v. *Hebrew Ladies Orphan Society*, 85 Conn. 289, 295, *et seq.*, 82 Atl. 561. Among these rules are the following: that where more than one interpretation of language is permissible, restrictions upon the use of lands are not to be extended by implication; that doubtful language will be construed against rather than in favor of a restrictive covenant; that words are

to be taken in their ordinary and popular sense, unless it appears from the context that the parties used them in a different sense; and that where the meaning of language is doubtful it, with its context, is to be read in the light of surrounding circumstances presumably considered by the parties in using them.

Looking at the conditions attending and surrounding the Laurel Beach properties, the character of their use and the language of the restriction itself, its purpose is manifest. Its aim beyond question, as the court has in effect found it to have been, was to contribute to make the restricted property desirable as a location for a summer residence colony, by forbidding erections thereon which might detract from its attractiveness or be deemed otherwise objectionable. Small structures scattered over the tract might well be regarded objectionable from an æsthetic point of view, and structures devoted to certain uses might be offensive for more substantial reasons. At the time that the restriction was framed and imposed, the classes of structures which might most reasonably be anticipated, under the conditions then existing, were barns, where horses could be stabled, and privies, both objectionable for similar substantial reasons and naturally expected to be erected, if erected at all, quite apart from the dwellings. Such other structures as might have been anticipated would neither in themselves, nor in their use, have been of a kind to be objectionable otherwise than æsthetically. This would be true of the more modern garage, and it is scarcely conceivable that a garage appurtenant to a house, so constructed as not to give the effect of a separate building and so attached to the house as to present the appearance of a part of it, could be considered objectionable from that point of view. This garage, as we read the record, was so built on to the house that no one, not critically examining it, would be

struck with the fact that it was not a part of the dwelling-house structure and used for the immediate purposes of residence and housekeeping therein. Its points of contact with the house were, to be sure, not extensive, and the critical observer might conclude that there was no interior means of communication between it and the house, but for all that it might well, as far as structure and location were concerned, be adapted for summer housekeeping purposes. Whether or not, therefore, an outhouse is of necessity a structure separate and standing physically apart from the dwelling-house to which it is subservient, we are of the opinion that the present structure is not one forbidden by either the letter or spirit of the restrictive covenant in controversy, interpreted according to the manifest intent and purpose of those who imposed it.

This conclusion renders it unnecessary to consider other questions presented by the appeal.

There is no error.

In this opinion the other judges concurred.