DAUGHTERS OF ST. PAUL, INC. *v.* ZONING BOARD OF APPEALS OF THE TOWN OF TRUMBULL
(6278)

DUPONT, C. J., BORDEN and BIELUCH, Js.

Argued September 14—decision released October 21, 1988

*Mark T. Altieri,* with whom, on the brief, was *Burton S. Yaffie,* for the appellant (defendant).

*Gregory M. Conte,* for the appellee (plaintiff).

BORDEN, J. The defendant appeals from the judgment of the trial court sustaining the plaintiff's challenge to the denial of an application for a special exception. The plaintiff's application sought approval to construct a convent and religious book and audio-visual center in a residential zone. Of the six reasons given by the defendant for denying the application, five remain as issues before us:[1] whether the trial court erred in holding (1) that the proposed convent and book center would not constitute a prohibited use in a residential zone; (2) that the proposed facility was a "church or other place of worship" within the meaning of the applicable town zoning regulation; (3) that the rear setback of the facility was in compliance with the zoning regulations; (4) that the design of the build-

---

[1] At oral argument in this court, the defendant withdrew one of the issues, namely, whether the proposed facility provided adequate off-street parking.

ing was in reasonable harmony with surrounding residential structures; and (5) that the facility would not create or exacerbate traffic and congestion problems in the neighborhood. We find no error.

The following facts are not in dispute. The plaintiff is a Roman Catholic order of nuns. For several years the plaintiff has maintained a convent and Roman Catholic bookstore in downtown Bridgeport. In 1986, the plaintiff purchased a lot in a residential zone on the southeast corner of the intersection of Main Street and Botsford Place in the town of Trumbull, with the intention of erecting and relocating to a new facility there. The proposed facility would consist of a main building and a garage. The ground floor of the main building would house a chapel, living room, dining room, kitchen and a large area for the book and audiovisual center; the second floor would contain eight small bedrooms and three bathrooms. The garage would be connected to the main building by a glass-enclosed, covered walkway, eighteen feet, six inches in length, and the eastern wall of the garage would be twenty feet, six inches, from the rear property line.

The plaintiff filed an application with the defendant requesting a special exception in accordance with Article II, § 1 B (2) of the town zoning regulations.[2] The

[2] Article II, § 1 B of the town zoning regulations provides in pertinent part: "Special Exceptions. The following uses may be permitted as special exceptions provided that the Zoning Board of Appeals finds that adequate off-street parking facilities are provided in connection therewith; that the existing public streets are suitable and adequate to handle any additional traffic generated by the proposed use; that no hazard to the public health or safety will result from the proposed use or the traffic generated thereby; that the land on which such use is to be conducted is landscaped in such a manner and the buildings in which such case [sic] is to be conducted are so designed in external appearances and layout that reasonable harmony with surrounding residential structures is maintained; that said land and buildings as so used will not detract from the residential character of the neighborhood in which they are located and will not adversely affect property values in said neighborhood; and that the proposed use will not con-

defendant, citing the aforementioned reasons, denied the request after a public hearing. The plaintiff appealed to the Superior Court, which reversed, holding that "the only reasonable conclusion is that the plaintiff was entitled to the special permit requested," and that for the board to find otherwise was arbitrary and an abuse of discretion. We granted certification for appeal to this court.

I

When considering an application for a special exception, a zoning authority acts in an administrative capacity, and its function is to determine whether the proposed use is expressly permitted under the regulations, and whether the standards set forth in the regulations and statutes are satisfied. *A. P. & W. Holding Corporation* v. *Planning & Zoning Board,* 167 Conn. 182, 185, 355 A.2d 91 (1974). It has no discretion to deny the special exception if the regulations and statutes are satisfied. *Westport* v. *Norwalk,* 167 Conn. 151, 155, 355 A.2d 25 (1974). When a zoning authority has stated the reasons for its actions, a reviewing court may determine only if the reasons given are supported by the record and are pertinent to the decision. *Spectrum of Connecticut, Inc.* v. *Planning & Zoning Commission,* 13 Conn. App. 159, 163–64, 535 A.2d 382, cert. denied, 207 Conn. 804, 540 A.2d 373 (1988). The zoning board's

travene any of the purposes of zoning as set forth in Section 8-2 of General Statutes of Connecticut, Revision of 1958 and provided further that the Zoning Board of Appeals shall determine the minimum yards and maximum lot coverage to be applied in said special exception, such minimum yards and maximum lot coverage shall in no event be less than is prescribed in the Schedule under Article III, and may impose such further conditions in connection with the proposed use as it shall deem necessary to satisfy the conditions and standards set forth herein:

\* \* \*

"(2) Churches and other places of worship, including parish houses and Sunday School buildings; non-profit primary and secondary schools; and buildings housing personnel affiliated with said churches and schools."

action must be sustained if even one of the stated reasons is sufficient to support it. *Torsiello* v. *Zoning Board of Appeals,* 3 Conn. App. 47, 50, 484 A.2d 483 (1984). In light of the existence of a statutory right of appeal from the decisions of local zoning authorities, however, "a court cannot take the view in every case that the discretion exercised by the local zoning authority must not be disturbed, for if it did the right of appeal would be empty . . . . In reviewing the action of the trial court, we have to decide whether it could in logic and in law reach the conclusion that the [defendant] should be overruled." *Suffield Heights Corporation* v. *Town Planning Commission,* 144 Conn. 425, 428, 133 A.2d 612 (1957).

## II

The defendant first claims that the trial court erred in holding that the board abused its discretion when it found that the proposed use was commercial and accordingly not a "church[3] or other place of worship" within the meaning of Article II, § 1 B (2). We do not agree.

These two claims—that the proposed convent was a commercial use, and that it was not a church or other place of worship—were listed as two separate reasons in the defendant's decision. We treat them together, however, because the first reason, that the proposed use was commercial, cannot stand on its own. The town

---

[3] The defendant found that the proposed building would not be used as a "church." It did not specifically determine that the building would not constitute an "other place of worship," but that determination is implicit in the defendant's decision. Although it is not entirely clear, it appears that the trial court found that the facility was both a "church" and a "place of worship." On appeal to this court, neither party has focused on the difference, if any, between the two terms, and we do not believe it is necessary to do so in this case. We therefore view this issue as whether the board was justified in deciding that the plaintiff's facility was not a "church or other place of worship."

zoning regulations do not exclude all commercial uses from residential zones; farms are allowed as a permissive use, and hospitals and convalescent homes as special exception uses. Certainly, farms, hospitals and convalescent homes may be commercial enterprises, whether they are operated for profit, or are nonprofit in nature, while at the same time being allowable uses in residential zones. Article II, §§ 1 A (6) and 1 B (5). Therefore, the zoning board could not use this reason alone to exclude the proposed convent. *Beckish* v. *Planning & Zoning Commission,* 162 Conn. 11, 15, 291 A.2d 208 (1971) (a condition imposed by the commission without being warranted by the regulations is void). The board's argument on appeal, however, has made it clear that the first two reasons are to be read together.

"Whether a use is a religious one is a question of fact." 2 R. Anderson, American Law of Zoning (3d Ed.) § 12.29; *Rapid City* v. *Kahler,* 334 N.W.2d 510, 512 (S.D. 1983). When a building is used for more than one purpose, "[t]he main, principal and dominant use of [the] building determines its character." *Fox* v. *Zoning Board of Appeals,* 146 Conn. 70, 75, 147 A.2d 472 (1958). That determination is also a question of fact. See id., 75–77; *West Hartford* v. *Rechel,* 190 Conn. 114, 119, 459 A.2d 1015 (1983).

In this case, the principal factual question resolved by the defendant was whether the proposed facility constituted a church or other place of worship. It is clear that, if the facility were composed solely of the convent and chapel, the question would be whether the proposed convent and chapel constituted a church or other place of worship. It is also clear that, conversely, if the facility were composed solely of the book and audiovisual center, the plaintiff would have no valid claim that it constituted a church or other place of worship. Where the two uses are combined, therefore, the factual question resolved by the defendant breaks down

into two separate but related issues: (1) whether the convent and chapel constitute a church or other place of worship; and (2) if so, whether the presence of the book and audiovisual center renders the dominant use of the building to be something other than as a church or other place of worship. We therefore consider whether the record reasonably supports either a negative answer to the first question or a positive answer to the second question. If so, the defendant's determination must be upheld. We conclude that under the facts of this case the defendant could not reasonably conclude (1) that the convent and chapel do not constitute a church or place of worship, and (2) that the dominant use of the facility was other than for a church or other place of worship.

The following evidence was presented to the defendant. The plaintiff's purpose, as stated in its corporate articles of organization, is "to do general missionary work; to give moral instruction to the public; to edit, print and publish books, periodicals, bulletins and papers in connection with said missionary work. For the purpose of the dissemination of religious and educational instruction. To educate and train young women for the sisterhood and to receive, maintain and administer funds for religious and educational services. To expend and apply funds or income for these purposes; to acquire, hold and lease and manage such real estate as may be necessary for the purpose." The plaintiff is a nonprofit corporation. As proposed, the convent would contain a chapel, living and dining areas for the nuns, and a work area where religious and educational literature and tapes would be displayed for sale to the public. The "book center," as the work area was termed in the plaintiff's application,[4] would be open

---

[4] The defendant in its brief quotes a portion of the plaintiff's testimony at the aggrievement hearing, wherein the plaintiff referred to the proposed facility variously as a "book center and convent" and as a "book *store.*"

to the public on weekdays from 9 a.m. to 5 p.m., and on Saturday mornings. The chapel would be open and available to the public for prayer and meditation whenever the book center was open. The nuns would use the chapel for prayer two and one-half hours each weekday as part of their normal activities, and for mass on Sundays. The plaintiff's activity would be under the supervision of a local parish priest and the bishop of the diocese. The book center would be the largest single area in the building, although it would occupy no more than one third of the floor space in the building. The books and audiovisual material on display and for sale would be religious and educational in nature, and in support of the religious order's missionary and instructional purposes.

Although the question of whether a building constitutes a church or other place of worship is factual, this sensitive determination must be informed by a recognition of the protection afforded the free exercise of religion by the constitutions of Connecticut; Conn. Const., art. I § 3; and of the United States; U.S. Const., amend. I. " '[T]he concept of what constitutes a church has changed from a place of worship alone, used once or twice a week, to a church used during the entire week, nights as well as days, for various parochial and community functions.' " *Beit Havurah* v. *Zoning Board of Appeals,* 177 Conn. 440, 447–48, 418 A.2d 82 (1979), quoting 2 A. Rathkopf, The Law of Zoning and Planning § 20.03, p. 20–53 (1978). The question of whether a particular use is entitled to recognition as an accessory use for a church must be resolved with appropriate deference to "the primary use to which it is

---

(Emphasis added.) The defendant argues that the use of the word "store" indicates that the principal use of the facility would be commercial. The question we must resolve, however, is not whether "store" connotes commercialization, but whether the primary use of the facility falls within the applicable special exception use.

incidental." Id., 447. The question of whether a particular use of a building qualifies the structure as a church or other place of worship demands similar deference.

Applying these principles to the facts of this case, we conclude that the defendant could not reasonably conclude that the convent and chapel, apart from the book and audiovisual center, would not constitute a church or other place of worship. It was undisputed that the plaintiff is an order of Roman Catholic nuns. The chapel would be open to the public during weekdays and on Saturday, and would be used by the nuns for prayer two and one-half hours daily and for mass on Sundays. These facts compel the conclusion that the convent and chapel constitute a church or other place of worship.

The question of whether the record supports the defendant's decision that the book and audiovisual center renders the dominant use of the facility to be something other than that of a church or other place of worship, presents a closer question. We conclude, nonetheless, that under the particular facts of this case, the defendant was not justified in making that decision.

The defendant analogizes this case to a freestanding hospital thrift shop separate from the hospital itself, or to a monastery housing a shop that sells goods and services to the general public for the purpose of raising funds for the support of the facility. Thus, the defendant argues, this is essentially a commercial retail use open to the general public which so overshadows any religious use as to render that use subsidiary. In this case, however, the principal characteristic of the proposed book and audiovisual center, as evidenced by the purposes set forth in the plaintiff's articles of organization, the nature of its proposed inventory, the presence of an adjoining chapel in the convent open to

the patrons of the center, and the plaintiff's nonprofit status, is the dissemination of religious doctrine and instructional material, not the mere selling of books. The goods sold here are not of a secular nature, as in the defendant's analogies, but are an adjunct to the plaintiff's primary purpose, namely, to do missionary work in support of the Roman Catholic faith.

The defendant's argument also relies on the fact that the book and audiovisual center occupies more floor space than the chapel. We do not question that the relative size of the spaces devoted to differing uses is relevant to the determination of the dominant use of a facility. *West Hartford* v. *Rechel,* supra. That factor alone, however, is an insufficient basis in this case for a finding that the dominant use of the facility would be as a commercial bookstore, rather than as a church or other place of worship.

First, the space devoted to the living quarters of the nuns must be taken additionally into account in measuring these relative spaces. This factor is derived from Article II, § 1 B (2) of the zoning regulations, which includes, in addition to churches and other places of worship, "buildings housing personnel affiliated with said churches . . . ." It would be an artificial yardstick that measures only the chapel space itself, without also including the part of the building housing and sustaining the nuns who maintain and use it. When this space is considered in the calculation, the book and audiovisual center occupies approximately one third of the facility's area, and the convent and chapel occupy approximately two-thirds. Furthermore, because the chapel is open to the public whenever the center is open, and because the nuns use the chapel for worship on Sundays when the center is closed, the church or other place of worship is in use for more hours per week than the book and audiovisual center.

Second, the use of the book and audiovisual center is integrally related to that of the convent and chapel. The plaintiff proposes to use the center to make religious literature and other materials available to its visitors. In a different, but closely related, context, the United States Supreme Court has noted that "the mere fact that . . . religious literature is 'sold' . . . rather than 'donated' does not transform evangelism into a commercial enterprise." *Murdock* v. *Pennsylvania,* 319 U.S. 105, 111, 63 S. Ct. 870, 87 L. Ed. 1292 (1943). In *Beit Haruvah* v. *Zoning Board of Appeals,* supra, our Supreme Court implicitly cautioned that a church's accessory use must be regarded broadly for zoning purposes, in order to avoid serious constitutional questions. That same caution is required here, where we are determining the close question of whether the dominant use of the building should be characterized by its use as a church or other place of worship, or by its use for selling religious material that is closely related to that place of worship.

### III

The defendant next claims that the trial court erred in holding that the defendant abused its discretion when it found that the rear setback of the proposed facility did not meet the minimum setback requirement of fifty feet. We disagree.

The defendant found that "[t]he rear setback does not meet the minimum setback requirement of fifty feet." The trial court reversed the board for two reasons. First, it concluded as a matter of law that the garage fell within the definition of "accessory building" found in Article I, § 3 L, and second, that Article III, § 3 B required accessory buildings to stand only twenty feet from the rear property line, as opposed to the fifty foot requirement for houses. The garage at issue would stand twenty feet, six inches, from the rear

lot line. Thus, the trial court concluded, the garage met the applicable setback requirement. We agree with the trial court.

Article I, § 3 L defines an accessory building as "a subordinate . . . building which is customarily incident to the main . . . building and which is located on the same lot with said main . . . building." This definition undoubtedly applies to the garage in this case. Furthermore, Article III, § 3 A of the zoning regulations, which, inter alia, sets the height limits for accessory buildings, provides that "[a]ccessory buildings, *other than garages,* shall not exceed a height of 10 feet above ground level . . . ." (Emphasis added.) It is clear, therefore, that under the town's zoning regulations a garage located on the same lot as the main building is ordinarily considered to be an accessory building.

The defendant argues that the garage must be considered part of the main building because its connection to the main building is a glass-enclosed and covered walkway eighteen feet, six inches long. The defendant cites no authority for its position, but, in an effort to give the defendant's decision every presumption of validity; see *Eden* v. *Town Plan & Zoning Commission,* 139 Conn. 59, 89 A.2d 746 (1952); we will examine our Supreme Court's decision in *Misuk* v. *Zoning Board of Appeals,* 138 Conn. 477, 86 A.2d 180 (1952), which facially appears to support the defendant's argument.

In *Misuk,* the plaintiff's neighbor planned to erect a single family home and a garage on his newly purchased lot. The garage was to be attached to the house by an enclosed breezeway eight feet in length. Both the house and the garage were to be built of brick. The neighbor erred in measuring the distance from the property line to the nearest wall of the garage, so that as construction progressed, it became apparent that

the garage would stand only two feet from the property line, instead of eleven feet as planned. After the plaintiff's complaint to the building inspector resulted in construction's being halted, the neighbor applied for a variation in the side yard requirement. The board unanimously granted the variation, but the trial court reversed. The Supreme Court sustained the trial court, holding that a zoning ordinance excepting "a building of accessory use or garage" from the side yard requirements did not apply to the neighbor's garage, because it was "constructed as a part of the residence and [was] . . . architecturally in harmony with the house of which it is a part," and therefore was not an accessory building.

To apply the *Misuk* holding to the present case would engender several significant difficulties. In *Misuk,* there is no description of the construction of the breezeway and no discussion of the criteria by which the court determined that the garage constituted "part of the house." We do not know, for instance, whether the breezeway shared its roof with the house, the garage, neither, or both. The court did not indicate whether the length of the breezeway played any significant part in its conclusion that the garage was part of the house. Nor do we know whether the breezeway in *Misuk* was enclosed with the same building material as the house and garage.

This last question is important here because in *Bassett* v. *Pepe,* 94 Conn. 631, 110 A. 56 (1920), the only Connecticut case on which the *Misuk* court relied in determining this issue, the court's analysis turned on whether a person, "not critically examining [the garage], would be struck with the fact that it was not a part of the dwelling-house structure and used for the immediate purposes of residence and housekeeping therein." Id., 638–39. This mode of inquiry is helpful in considering the application of *Misuk* here.

The case before us presents the following facts. The garage stands on its own foundation. It has four walls, none of which is in common at any point with the walls of the main building, and a roof not at any point in common with that of the main building. The walkway has its own, narrow roof, pitched at an angle. This roof meets the roof of the garage and the roof of the convent, but is not part of either. Unlike the brick·walls of the convent and the garage, the walls of the walkway are glass; the walkway walls therefore could not be seen as an extension of either the walls of the convent or the garage. The walkway is eighteen feet, six inches long, and the open area between the convent and garage is covered with grass, except for the concrete of the walkway itself. The casual observer could not fail to note that he was viewing two discrete buildings joined by a glass-enclosed passageway.

Both *Misuk* and *Bassett* stress the concept of physical separation as essential to an accessory building's identity. In *Bassett,* the garage itself touched the house; in *Misuk* a short, enclosed breezeway of unknown construction connected the two. The physical connection and any identity between the main building and garage in the present case is much less apparent.

In the enforcement of zoning regulations which are in derogation of common law property rights, such regulations are to be construed strictly and should not be extended by implication. *Planning & Zoning Commission* v. *Craft,* 12 Conn. App. 90, 96, 529 A.2d 1328, cert. denied, 205 Conn. 804, 531 A.2d 937 (1987); see also *Bassett* v. *Pepe,* supra, 637 ("where more than one intepetation of language is permissible, restrictions upon the use of lands are not to be extended by implication . . . doubtful language will be construed against rather than in favor of a [restriction]"). Common sense must be used in interpreting a zoning regulation, because it is assumed that the zoning authority

intended to accomplish a reasonable and rational result. See *Hall* v. *Planning Board,* 2 Conn. App. 49, 52, 475 A.2d 1114 (1984).

It does not comport with common sense to construe the term "accessory building" so as to exclude a freestanding garage that is unmistakably a separate building, merely because there is an eighteen foot, six inch long, glass-enclosed, covered walkway between the garage and the main building. It also constricts the meaning of accessory building in such a way that the plaintiff's common law property rights are disparaged to an extent beyond that authorized in the zoning regulations. For these reasons we decline to extend the holding in *Misuk* v. *Zoning Board of Appeals,* supra, to the facts of the present case.

## IV

The defendant's final claims are that the trial court erred in holding that the board abused its discretion when it found that the proposed facility's design was not in reasonable harmony with surrounding structures, and that the proposed use would be a detriment to the neighborhood by increasing traffic congestion. See footnote 2, supra. These claims must fail.

As we have already noted, the application of zoning regulations to restrict religious uses raises concern over the possible infringement of the constitutional rights guaranteed by the free exercise of religion clauses. The courts have been reluctant to uphold the strict enforcement, against religious uses, of regulations that require special exception uses to be in architectural harmony with the surrounding neighborhood. 2 R. Anderson, American Law of Zoning (3d Ed.) § 12.27. The possibility of discriminatory abuse of such regulations is obvious.

This possibility is rendered even more grave by virtue of the ability of zoning authorities essentially to insulate such a subjective decision from judicial review by failing to cite facts that support their decision. A zoning authority may act upon facts known to it even though those facts are not offered in evidence at the hearing; *Mrowka* v. *Board of Zoning Appeals,* 134 Conn. 149, 154, 55 A.2d 909 (1947); and the reasons given by a zoning authority, presumably composed of lay persons, to justify its action need not be in a form to satisfy the meticulous criterion of a legal expert. *DeMars* v. *Zoning Commission,* 142 Conn. 580, 584, 115 A.2d 653 (1955). Nonetheless, this court can review the reasonableness of the board's finding; see *Spectrum of Connecticut, Inc.* v. *Planning & Zoning Commission,* supra; by determining whether the reasons given are supported by the record and are pertinent to the decision. Id. The great weight of the constitutional issues implicated leads us to conclude that, under the circumstances here, such a subjective decision as the one now under review must be reasonably supported by facts discernible in the record. Our thorough search of the record fails to disclose such facts.

In the present case, the proposed building came within the exterior dimension limits for an ordinary dwelling in a residential zone and, according to the building's architect, was designed specifically to blend with the architecture of the surrounding homes. The board heard the testimony of the plaintiff's architect, who described the design of the exterior of the building as mixed colonial and traditional, with a pitched, asphalt shingled roof and a low profile, in keeping with the residential architecture in the neighborhood. The exterior walls would be brick and the proposed building would be one-third larger than the house presently situated on the lot. The property would be landscaped and would retain most of the trees presently on the lot.

The architectural renderings of the facility in the record are consistent with this testimony.

The only evidence in the record that militates against the conclusion that the building would be in harmony with the surrounding homes was the somewhat contradictory testimony of two lay individuals at the application hearing. One testified that the houses on Botsworth Place "are all modern"; the other stated that most of the houses on Botsworth Place "are raised ranches, and capes." Both maintained, without offering any supporting facts, that the proposed building would not be in harmony with the surrounding structures. We find this testimony incapable of supporting the board's decision, in light of the other testimony offered, and in light of the objective evidence of the architectural renderings, which indicate no basis for a conclusion that the proposed facility would not be in reasonable architectural harmony with residences that are "modern," "raised ranches" or "capes."

Finally, the board had before it evidence, given by the plaintiff's expert traffic engineer and essentially uncontradicted, that Main Street near the intersection of Botsworth Place carried a daily traffic volume of over 18,000 cars. He estimated that the proposed use would draw approximately twenty cars per day to its parking lot. In addition, the only evidence before the board concerning an increase in commercial traffic caused by the proposed use indicated that the book center might require one United Parcel Service delivery per day. The record, therefore, does not support the board's conclusion that the proposed use would cause a detriment to the neighborhood by reason of traffic and congestion. *Torsiello* v. *Zoning Board of Appeals,* 3 Conn. App. 47, 50, 484 A.2d 483 (1984).

There is no error.

In this opinion the other judges concurred.